**Opinion issued August 22, 2019**



In The

# Court of Appeals

### For The

# First District of Texas

_____

## NO. 01-19-00285-CV

_____

## IN THE INTEREST OF K.M., JR., A MINOR CHILD

_____

### On Appeal from the 315th District Court
### Harris County, Texas
### Trial Court Case No. 2017-04805J

_____

\*     \*     \*

In The

# Court of Appeals

### For The

# First District of Texas

_____

## NO. 01-19-00286-CV

_____

**IN THE INTEREST OF K.M., A MINOR CHILD**

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-01409J**

**MEMORANDUM OPINION**

These are accelerated appeals from the trial court's decrees terminating the parental rights of K.M. ("Father") and D.M. ("Mother") to their two minor children, K.M. Jr. ("Kevin") and K.M. ("Karen").[1] The case arose when a narcotics investigation led police to a hotel, where they discovered Father, Mother, and Kevin living in a room covered in dog feces and trash. The police arrested Father and later returned to arrest Mother—who fled by jumping out of the second-story window, leaving Kevin and another child in the hotel room alone. The Texas Department of Family and Protective Services was appointed Kevin's temporary managing conservator, and, after Mother gave birth to Karen, the Department was appointed Karen's temporary managing conservator as well. Over the following year-and-a-half, Father and Mother consistently tested positive for cocaine and related substances, and their parental rights to both children were terminated after a bench trial.

---

[1]    *See* TEX. R. APP. P. 28.1, 28.4; *see also* TEX. FAM. CODE § 109.002(a–1).

Father's counsel filed a brief raising four issues, three of which challenge the legal and factual sufficiency of the trial court's predicate findings under Section 161.001(b)(1),[2] and one of which challenges the legal and factual sufficiency of the trial court's best-interest finding under Section 161.001(b)(2).[3] Mother's counsel filed a motion to withdraw and corresponding *Anders* brief,[4] arguing Mother's appeal is without merit, and there are no grounds for reversal because there is legally and factually sufficient evidence to show that (1) Mother had her parental rights to an older child from a previous relationship terminated on endangerment grounds and (2) termination of Mother's parental rights to Kevin and Karen was in the children's best interest.

We overrule Father's issues, deny Mother's counsel's motion to withdraw, and affirm the trial court's decrees of termination.

## Background

### *The Department receives a referral accusing Mother and Father of physical neglect and neglectful supervision*

Father and Mother have two children together: Kevin, who was born in December 2016, and Karen, who was born in March 2018. This case began in

---

[2]      *See* TEX. FAM. CODE § 161.001(b)(1).

[3]      *See* TEX. FAM. CODE § 161.001(b)(2).

[4]      *See Anders v. California*, 386 U.S. 738 (1967).

August 2017, roughly eight months before Karen was born, when the Department received a referral accusing Mother and Father of physical neglect and neglectful supervision of Kevin.

On August 2, 2017, Mother was pulled over by officers conducting a narcotics investigation. Mother did not have her identification, so the officers allowed her to retrieve it from the hotel room where she had been living with Kevin, Father, and Father's twelve-year-old daughter from a prior relationship. However, when the officers arrived at the hotel room, Mother was not there. Instead, they found Father, whom they arrested due to an outstanding felony warrant.

The officers later verified Mother's identity, discovered that she also had an outstanding arrest warrant, and returned to the hotel room the next day to arrest her. But when they arrived, Mother fled by jumping out of the second story hotel room window—abandoning Kevin, then eight months old, and Father's daughter, both of whom remained in the hotel room, which was covered in dog feces and trash. Mother was found and arrested later that day. The officers filed a referral.

As the Department investigated the referral, it discovered that Mother's parental rights to an older child from a previous relationship had been terminated in 2012 and that Mother was currently pregnant with her third child. The Department also discovered that Mother and Father had extensive criminal records.

4

Mother had convictions for theft, prostitution, and possession of cocaine, while Father had convictions for criminal mischief, harassment, forgery, unauthorized use of a vehicle, and possession of cocaine. Both had also been arrested and jailed on charges that were eventually dropped or for which they received probation.

***The Department petitions to terminate Mother's and Father's parental rights to Kevin and Karen***

In October 2017, the Department filed a petition to terminate Mother's and Father's parental rights to Kevin, and the trial court appointed the Department Kevin's temporary managing conservator. Kevin was then placed with a foster-to-adopt father.

The trial court then approved and required Mother and Father to follow family service plans prepared for them by the Department. As relevant here, the plans required Mother and Father to remain drug-free, submit to random drug testing, undergo substance abuse treatment, and attend Narcotics Anonymous meetings. The plans included the statutorily-required admonishment that failure to comply could result in the termination of their parental rights. *See* TEX. FAM. CODE § 263.102(b).

Mother and Father did not comply with their plans. Over the following year-and-a-half, they consistently failed (or failed to appear for) random drug testing,

testing positive for cocaine and related substances throughout the entire case.[5]

Although Mother and Father periodically provided negative urine samples, Father never provided a negative hair follicle sample and Mother provided a negative sample only once.[6] Moreover, the levels of cocaine in their hair follicle samples did not decrease steadily (indicating sobriety) but rather fluctuated up and down, (indicating periodic drug use).

Mother and Father continued to test positive after completing substance abuse treatment, and, as a result, their plans were amended to require them to undergo additional treatment. Although both of them claimed to have attended NA meetings, they failed to provide proof to the caseworker.

In March 2018, during the pendency of Kevin's termination proceeding, Mother gave birth to Karen. Before Mother and Karen were discharged from the

---

[5] Father tested positive on (1) January 10, 2018, (2) February 23, 2018, (3), August 20, 2018, (4) October 10, 2018, and (5) December 5, 2018. Father failed to submit to drug testing and was thus presumed to have tested positive on (1) February 7, 2018, (2) March 28, 2018, (3) April 2, 2018, (4), May 7, 2018, (5) May 31, 2018, (6) June 5, 2018, (7) September 14, 2018, (8) September 25, 2018, (9) November 16, 2018, (10) November 29, 2018, and (11) December 21, 2018. Mother tested positive on (1) October 27, 2017, (2) December 13, 2017, (3) February 23, 2018, (4) April 2, 2018, (5) October 10, 2018, and (6) December 5, 2018. Mother failed to submit to drug testing and was thus presumed to have tested positive on (1) February 7, 2018, (2) March 28, 2018, (3) May 7, 2018, (4) May 31, 2018, (5) June 5, 2018, (6) September 14, 2018, (7) September 25, 2018, (8) November 16, 2018, (9) November 29, 2018, and (10) December 21, 2018.

[6] On August 20, 2018, Mother underwent a urinalysis and hair follicle test, both of which were negative. However, Mother later relapsed and failed several subsequent drug tests.

hospital, the Department received a referral accusing Mother and Father of neglectful supervision of Karen. The referral was based on their continued drug use—including drug use during Mother's pregnancy—and evidence that Karen had exhibited signs of drug withdrawals after birth.

Later that month, the Department filed a petition to terminate Mother's and Father's parental rights to Karen, and the trial court appointed the Department Karen's temporary managing conservator. Karen was placed with the same foster father as Kevin. Kevin and Karen were then temporarily removed from the foster placement and placed with fictive kin, the children's godparents. However, the placement was ultimately unsuccessful because of an adverse development in the godparents' financial situation, and the children were placed back with the foster father, where they remained for the rest of the case.

### *The case is tried to the bench*

The two cases were tried jointly in March 2019. At the bench trial, the Department presented a number of exhibits, including Mother's and Father's drug test results and criminal records. Four witnesses testified: Mother, Father, the caseworker, and a court-appointed child advocate.

**Mother's testimony.** Mother testified that Kevin had come to the Department's attention because she had "jumped out a window" when police arrived at the hotel room they were living in August 2017. Mother admitted that

she had been trying to flee from the police because she knew she had an outstanding warrant and did not want to go to jail. Mother admitted that, when she fled from the police, she left Kevin and Father's daughter alone in the hotel room. But she insisted that she had called someone to watch the children and that the person was en route when she jumped out the window. Mother did not identify specifically who she had called or explain that person's relationship to her or the children.

Mother testified that Father was not in the hotel room at that time because he had been arrested the day before. She explained the incident where she was in a vehicle that was pulled over by the police and thereafter ran away. She further explained that Father was subsequently arrested on warrants when the police came to the hotel room where they were staying. Mother testified that the family had been living in the hotel for about six months and that, at the time of the arrests, she was not working, but Father was working as a security guard at the same hotel.

Mother admitted that she had her parental rights to her oldest son terminated in 2012. During the pendency of that proceeding, she met and began dating Father. And once the termination was finalized, she began to use hard drugs, including crack cocaine.

Mother admitted to extensive past drug use, and she admitted to past drug dealing, including drug dealing as late as 2017 after Kevin was born. She denied

any drug use after her release from jail in August 2017 and claimed that any subsequent positive tests were attributable to drug use that had occurred before that date. She was unable to explain why the levels of cocaine in her urine and hair follicle samples periodically spiked.

**Father's testimony.** Father admitted that, when he was arrested at the hotel in August 2017, there were drugs in the hotel room. He insisted, however, that the drugs belonged to an unidentified third party and not to Mother or to him.

Like Mother, Father admitted to extensive past drug use. He admitted that he began using crack cocaine before meeting Mother in 2012 and that he used the drug regularly over many years. He admitted to regular use of the drug in 2016 after Kevin was born. And he admitted to using the drug in 2017 with Mother when she was pregnant with Karen.

Father further admitted to using the drug during the pendency of the termination proceedings. Father admitted that he had relapsed during the pendency of the case, but he claimed that he stopped using the drug in April 2018. However, like Mother, Father was unable to explain why the level of cocaine in his samples spiked after that date.

Father testified that he provided financially for both himself and Mother. Father testified that they lived apart because of the possibility of Mother's prior termination affecting the outcome of these cases. However, Father admitted that

9

Mother would look after the children while he was at work if the court would return the children to him. Father testified that it was his request and desire for the court to return the children to both of them.

**The caseworker's testimony.** The caseworker testified that the Department's goal was termination because the parents had not shown that they are able to stop using cocaine. The Department was therefore concerned that the parents would continue to abuse drugs and not be able to properly care for their children. The caseworker explained that this was the parents' second attempt at group counseling "because they had to be reassessed due to them continuing to test positive." The parents had also failed to complete NA as required. The caseworker disagreed with Father's testimony that no one ever explained to him that he had to attend NA meetings. The caseworker testified that she met Father in person each month and discussed the remaining requirements of Father's plan, including the requirement to attend NA meetings. The caseworker further testified that neither parent provided her with proof that they had attended NA meetings.

The caseworker testified that the children were placed with a foster-to-adopt parent and that the adoption could not take place if the parents' rights were not terminated. The caseworker explained that the children were initially placed with the foster father but were then removed and placed with fictive kin, the children's godparents. However, the placement with the children's godparents was ultimately

unsuccessful because the godmother lost her job, thereby preventing the couple from supporting the children financially. The children were then returned to the foster father, who cared for them for the remainder of the proceedings. The caseworker testified that the children were very well bonded to their foster father and called him "Dad." She further testified that the current foster parent was "great" and was very engaged with the children. The caseworker believed that the foster father communicated very well with her regarding the children's needs, that he loved them, and that the placement would be a very good one for the children.

The caseworker testified that the Department believed termination was in the children's best interest because the children were young and bonded with a stable and loving foster parent and because the parents had been given the opportunity to show they could live drug free but continued to test positive.

**The advocate's testimony.** The advocate's testimony was similar to and corroborated the caseworker's. The advocate recommended that the parents' rights be terminated because of their continued drug use and failure to complete services. Because of the parents' continued drug use, the advocate did not believe the parents could provide a safe environment and stable home for the children.

The advocate agreed with the current placement. She testified that there was mutual love between the children and the foster father, who, according to the advocate, had done a "great job" in caring for the two young children. The

11

advocate noted that he would not be able to adopt the children if Mother's and Father's parental rights were not terminated.

After the trial, the trial court entered decrees terminating Mother's and Father's parental rights to Kevin and Karen. In the decrees, the trial court found that termination of Mother's parental rights was justified under subsections (D), (E), (M), and (O) and was in the children's best interest. The trial court found that termination of Father's parental rights was justified under subsections (D), (E), and (O) and was in the children's best interest.

Each parent filed a notice of appeal. Father's attorney filed a brief, and Mother's attorney filed a motion to withdraw and *Anders* brief.

## Termination of Father's Rights

In four issues, Father contends that the evidence is legally and factually insufficient to support the trial court's findings that (1) termination was justified under subsection (D), (2) termination was justified under subsection (E), (3) termination was justified under subsection (O), and (4) termination was in the children's best interest.

## A. Applicable law and standard of review

Under Section 161.001 of the Family Code, the Department may petition a trial court to terminate a parent-child relationship. The trial court may grant the petition if the Department proves, by clear and convincing evidence, that (1) the

parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the child's best interest. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002).

Section 161.001 lists 21 acts and omissions justifying termination of the parent-child relationship. TEX. FAM. CODE § 161.001(b)(1). As relevant here, termination is justified under Section 161.001 if the parent:

- knowingly places or knowingly allows the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child, *id.* § 161.001(b)(1)(D);

- engages in conduct or knowingly places the child with persons who engage in conduct that endangers the physical or emotional well-being of the child, *id.* § 161.001(b)(1)(E);

- has had his or her parental rights to another child terminated based on a finding of endangerment under subsection (D) or (E), *id.* § 161.001(b)(1)(M); or

- fails to comply with the provisions of a court order that specifically establish the actions necessary for the parent to obtain the return of the child, *id.* § 161.001(b)(1)(O).

Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston

[1st Dist.] 2016, pet. denied). However, when, as here, a parent's rights are terminated based on multiple predicate findings, including an endangerment finding, the parent is entitled to appellate review of the endangerment finding because of the consequences that the finding could have on his or her parental rights to other children[7]—even if another finding alone is sufficient to uphold termination. *In re N.G.*, No. 18-0508, 2019 WL 2147263, at *2 (Tex. May 17, 2019).

In determining whether termination is in the child's best interest, courts consider the nine nonexclusive factors listed by the Supreme Court of Texas in *Holley v. Adams*: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child

---

[7] Because only one ground is required to terminate parental rights and subsections (D) and (E) have consequences for termination of parental rights as to children in a future proceeding under subsection (M), terminating parental rights under subsections (D) and (E) implicates significant due process concerns for a parent's care, custody, and control of his or her children. *In re Z.M.M.*, No. 18-0734, 2019 WL 2147266, at *1 (Tex. May 17, 2019).

relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. 544 S.W.2d 367, 372 (Tex. 1976). The same evidence of acts or omissions used to establish ground for termination under Section 161.001(b)(1) may be probative in determining in the best interests of the child. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

In a legal-sufficiency review in a parental-rights-termination case, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id.*

In a factual-sufficiency review in a parental-rights-termination case, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). By focusing on whether a reasonable factfinder could form a firm conviction or belief, the appellate court maintains the required deference for the factfinder's role. *Id.* at 26. An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt. *Id.* We should consider whether

disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

**B.     Endangerment under Section 161.001(b)(1)(E)**

Because it affects our analysis of his other issues, we begin with Father's second issue, in which he contends that there is legally and factually insufficient evidence to support the trial court's finding under subsection (E) that he "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE § 161.001(b)(1)(E).

Subsection (E) focuses on conduct. For termination to be justified under subsection (E), the parent must have engaged, or knowingly placed the child with a person who engaged, in endangering conduct—i.e., conduct that exposes the child to loss or injury. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Termination under subsection (E) must be based on more than a single act or omission; rather, the statute requires a voluntary, deliberate, and conscious course of conduct by the

16

parent. *In re J.T.G.*, 121 S.W.3d at 125; *see* TEX. FAM. CODE § 161.001(b)(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

A finding of endangerment under subsection (E) may be supported by evidence that:

- the parent used illegal narcotics before or during the termination proceedings,[8]

- the parent knowingly left the child in the care of a known user of illegal narcotics, or

- the parent engaged in criminal conduct that resulted in, or could have resulted in, a sentence of confinement to jail or prison.[9]

The testimony and documentary evidence show that Father engaged in these three types of endangering conduct.

---

[8]    *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *Walker v. Texas Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 618 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

[9]    *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

First, the evidence shows that Father abused illegal narcotics—specifically, crack cocaine—both before and during the termination proceedings. Father admitted to regularly using cocaine before the Department received the referral for Kevin in 2017. He admitted to using cocaine both with friends and with Mother—including while Mother was pregnant. Father also admitted to using cocaine during the pendency of the termination proceedings. Father testified that he initially stopped using cocaine and completed his substance abuse treatment. But he admitted that he later relapsed in October 2018.

The drug tests presented by the Department confirmed that Father continued to use cocaine after the Department was appointed temporary managing conservator of Kevin in 2017 and after the Department was appointed temporary managing conservator of Karen in 2018. Although he periodically provided negative urine samples, Father never provided a negative hair follicle sample. Every hair follicle sample provided by Father during the pendency of the proceedings tested positive for cocaine or related substances, which shows that at no relevant time was Father completely drug free. Moreover, throughout the proceedings, the level of cocaine in his hair follicle samples did not decrease in a continuous fashion. Rather, they fluctuated up and down, reflecting periods of sobriety and relapse. Finally, Father failed to submit to random drug testing on 11

separate occasions and was presumed to have tested positive for drugs on each of these dates.

The evidence of Father's unabated drug use is legally and factually sufficient to support the trial court's finding that Father "engaged in conduct . . . which endangers the physical or emotional well-being of the child[ren]." TEX. FAM. CODE § 161.001(b)(1)(E); *see In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *Walker*, 312 S.W.3d at 617 ("Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under section 161.001(1)(E)."); *see also In re K.R.G.*, No. 01-16-00537-CV, 2016 WL 7368082, at *7 (Tex. App.—Houston [1st Dist.] Dec. 15, 2016, pet. denied) (mem. op.) ("Notably, illegal narcotics use creates the possibility that a parent will be impaired or imprisoned, and thus, incapable of parenting, supporting termination of parental rights under subsection E."); *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *10 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) ("Courts have also held that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.").

Second, Father left Kevin in the care of Mother, a person who both sold and used crack cocaine. Although Father denied knowing that Mother sold cocaine, the evidence permitted the trial court, as factfinder, to disregard Father's testimony and find that Father was aware of Mother's drug dealing. And even if Father was unaware that Mother sold cocaine, it is undisputed that he knew Mother was a heavy user of crack cocaine, which, as just discussed, is conduct sufficient to support a finding of endangerment under subsection (E). Thus, the evidence that Father left Kevin in the care of Mother is legally and factually sufficient to support the trial court's finding that Father "knowingly placed the child[ren] with [a] person[] who engaged in conduct which endangers the[ir] physical or emotional well-being." TEX. FAM. CODE § 161.001(b)(1)(E).

Finally, the evidence of Father's extensive criminal record supports the trial court's finding of endangering conduct. "Although incarceration alone will not support termination of parental rights, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment." *In re K.R.G.*, 2016 WL 7368082, at *7. And "[a]lthough [Father]'s convictions and terms of imprisonment occurred prior to the births of the children, courts look to what a parent did both before and after the children's births to determine whether termination of parental rights is necessary." *Id.* at *8. As we have explained, "conduct that routinely subjects children to the probability that they will be left

20

alone because a parent is jailed endangers both the physical and emotional well-being of the children." *Id.*; *see also In re T.G.R.–M.*, 404 S.W.3d. 7, 14–15 (Tex. App.–Houston [1st Dist.] 2013, no pet.) (considering "charges stemming from . . . two arrests [that] were ultimately dismissed" and noting each time mother was confined "she was absent from [child's] life and was not able to provide for [child's] physical and emotional needs"). Thus, "a parent's narcotics use, and the imprisonment relating to it, harm the physical and emotional well-being of children and the parent-child relationship." *In re K.R.G.*, 2016 WL 7368082, at *8. The evidence of Father's prior convictions and other criminal conduct, while perhaps insufficient alone to support a finding of endangerment, is evidence that the trial court could have reasonably considered together with the evidence of the parents' consistent drug use in finding that termination was justified under subsection (E).

We hold that there is legally and factually sufficient evidence to support the trial court's finding that termination of Father's parental rights to Kevin and Karen was justified on grounds of endangerment under subsection (E). Because we have determined that sufficient evidence supports termination under at least one predicate that could underlie a future subsection (M) termination, we see no basis for addressing Father's first issue, in which he contends the evidence is legally and factually insufficient to support the trial court's finding under subsection (D), or his third issue, in which he contends the evidence is legally and factually

21

insufficient to support the trial court's finding under subsection (O). Accordingly, we overrule Father's second issue and do not reach Father's first and third issues.

We turn now to the trial court's best-interest finding.

## C.  Best-interest finding

In his fourth issue, Father contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the children's best interest. To determine the sufficiency of the evidence, we consider the evidence relating to the relevant *Holley* factors.

**First factor—the desires of the children**. There is no direct evidence about the children's desires because they were less than two years old at the time of trial. *See Holley*, 544 S.W.2d at 371. "When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with [their] parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Kevin was eight months old when placed with his foster father. Karen was a newborn, less than a month old. At the time of trial, they had lived with their foster father for the majority of their lives, and the caseworker and advocate both testified that they had bonded with him. The caseworker and advocate further testified that the foster father loved both children and wished to adopt them. This evidence weighs in favor of the trial court's best-interest finding.

22

**Second factor—the emotional and physical needs of the children now and in the future**. The evidence relevant to the second factor includes Father's drug use, discussed at length above. *See Holley*, 544 S.W.2d at 371–72 (parent's drug use relevant to second factor); *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (concluding that past and ongoing drug use weighed in favor of conclusion that termination of parental rights is in child's best interest). Father's extensive use of crack cocaine in the years leading up to the termination proceedings, and his continued use of crack cocaine during the pendency of the proceedings, "show[s] a pattern of conduct that subjects [the] child[ren] to an uncertain and unstable life, endangering the[ir] physical and emotional well-being." *In re G.A.*, No. 01-11-00565-CV, 2012 WL 1068630, at *6 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, pet. denied) (mem. op.). This evidence weighs in favor of the trial court's best-interest finding.

Also relevant to the second factor is Father's criminal record. A parent's repeated arrests and incarcerations is evidence that the parent will be unable to satisfy his children's emotional and physical needs. *See In re T.G.R.-M.*, 404 S.W.3d at 15 (noting that each time mother was jailed, she was absent from child's life and unable to provide for child's physical and emotional needs); *see also In re K.R.G.*, 2016 WL 7368082, at *11 (evidence of repeated of repeated arrests and incarcerations can support trial court's best-interest finding). Here, Father's

23

criminal record includes at least five convictions and even more arrests—including the arrest resulting in the Department referral accusing Father and Mother of physical neglect and neglectful supervision of Kevin. That arrest, Father explained at trial, was for a probation violation. The underlying charge was possession of crack cocaine, which, Father further explained, he "took" to protect Mother from going to jail while pregnant with Kevin. This evidence weighs in favor of the trial court's best-interest finding.

Further evidence relevant to the second factor includes the condition of the hotel room in which Father, Mother, and Kevin were found living. The Department's report described the room as covered in dog feces and trash. *In re K.R.G.*, 2016 WL 7368082, at *10 (considering "very dirty" and "unsanitary" condition of home in which children were found in determining whether parent could satisfy children's physical and emotional needs). The unsanitary condition of the hotel room weighs in favor of the trial court's best-interest finding.

**Third factor—the emotional and physical danger to the children now and in the future**. The evidence relevant to the second factor is also relevant to the third factor. To repeat, this evidence includes: (1) Father's drug use, *see Holley*, 544 S.W.2d at 371–72 (parent's drug use relevant to third factor); *In re A.C.*, 394 S.W.3d at 642 (same); (2) Father's criminal record, *In re K.R.G.*, 2016 WL 7368082, at *10 (parent's criminal record relevant in determining emotional and

24

physical danger to children); *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Intentional criminal activity that exposes a parent to incarceration is conduct that endangers the physical and the emotional well-being of a child."); and (3) the unsanitary condition of the hotel room in which Father, Mother, and Kevin were found living. This evidence supports the trial court's best-interest finding.

**Fourth factor—the parental abilities of the individuals seeking custody**. The evidence relevant to the fourth factor includes some of the evidence discussed above, namely: (1) Father's drug use, *see Holley*, 544 S.W.2d at 371–72 (parent's drug use relevant to fourth factor); *In re K.P.*, 498 S.W.3d 157, 174 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("inability to remain sober" relevant to fourth factor); and (2) the condition of the hotel room, *see In re K.R.G.*, 2016 WL 7368082, at \*11 (condition of home relevant to assessing parental ability). Again, this evidence weighs in favor of the trial court's best-interest finding.

**Fifth factor—the programs available to assist the individuals seeking custody to promote the best interest of the children**. The trial court may properly consider whether the parent complied with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2018). Father's compliance with certain court-ordered tasks during the termination proceedings weighs in his favor and against the trial court's best-interest finding.

25

However, the evidence shows that he was unable to comply with the plan's most important requirements—to refrain from illegal drug use and to provide a drug-free environment for his children. This evidence weighs in favor of trial court's best-interest finding.

**Sixth factor—the plans for the children by the individuals seeking custody**. Because Mother's prior termination made it more likely that her parental rights to the children would be terminated in this case, Mother and Father began living separately, reasoning that the arrangement would make it more likely that at least Father's rights would not be terminated. But when asked who would care for the children while Father was at work in the event the children were returned to Father alone, Father testified that Mother would care for him, demonstrating that Father did not have a realistic plan in place for the care of the children. In contrast, the foster father had enrolled the children in daycare, which provided suitable care for the children while the foster father was at work. This evidence weighs in favor of the trial court's best-interest finding.

**Seventh factor—the stability of the home or proposed placement**. The evidence relevant to the seventh factor includes, once again, Father's drug use and the condition of the hotel room in which Father, Mother, and Kevin were found living. The evidence also includes Father's failure to provide the caseworker of proof of stable housing. Although Father claimed to be living with his brother and

brother's teenage son in their apartment, Father admitted that he never provided the caseworker with the lease agreement and never informed her of the address so she could inspect the premises. This evidence supports the trial court's best-interest finding.

In contrast, the caseworker and advocate both testified that the foster father provided the children with a stable, loving, and drug-free environment. They further testified that the foster father had demonstrated his commitment to the children by taking them back after the failed placement with the children's godparents. The evidence that the children's foster father intends to adopt them and provide them with a stable and permanent placement supports the trial court's finding. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of child and affirming finding that termination was in child's best interest when child was thriving in foster care).

We hold that there is legally and factually sufficient evidence to support the trial court's finding that termination of Father's parental rights to Kevin and to Karen was in the children's best interest.

We overrule Father's fourth issue.

**Termination of Mother's Rights**

Mother's court-appointed appellate counsel has moved to withdraw and has

filed an *Anders* brief, stating that, in his professional opinion, the appeal is without merit, and there are no arguable grounds for reversal. *See Anders*, 386 U.S. at 744.

*Anders* procedures are appropriate in an appeal from a trial court's final order in a parental-rights termination suit. *In re K.D.*, 127 S.W.3d 66, 67 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Counsel has certified that he delivered a copy of the brief to Mother and informed her of her right to examine the appellate record and to file a response. *See In re Schulman*, 252 S.W.3d 403, 408 (Tex. Crim. App. 2008). Mother did not timely file a response and the Department waived its right to respond.

The brief submitted by Mother's appointed appellate counsel states his professional opinion that no arguable grounds for reversal exist and that any appeal would therefore lack merit. *See Anders*, 386 U.S. at 744. Counsel's brief meets the minimum *Anders* requirements by presenting a professional evaluation of the record and stating why there are no arguable grounds for reversal on appeal. *See id.*; *Schulman*, 252 S.W.3d at 406–07.

When we receive an *Anders* brief from an appointed attorney who asserts that no arguable grounds for appeal exist, we determine independently whether arguable grounds exist by conducting our own review of the entire record. *Johnson v. Dep't of Family & Protective Servs.*, Nos. 01-08-00749-CV & 01-08-00750-CV, 2010 WL 5186806, at *1 (Tex. App.—Houston [1st Dist.] Dec. 23, 2010, no pet.)

(mem. op.); *see In re K.D.*, 127 S.W.3d at 67; *In re D.E.S.*, 135 S.W.3d 326, 330 (Tex. App.—Houston [14th Dist.] 2004, no pet.). If we determine that arguable grounds for appeal exist, we abate the appeal and remand the case to the trial court to allow the appointed attorney to withdraw. *See Johnson*, 2010 WL 5186806, at *2. Then, the trial court appoints another attorney to present all arguable grounds for appeal. *See id.* On the other hand, if our independent review of the record leads us to conclude that the appeal is frivolous, we may affirm the trial court's judgment by issuing an opinion in which we explain that we have reviewed the record and find no reversible error. *See id.*

Here, we have independently reviewed the record and conclude that there are no arguable grounds for review, that no reversible error exists, and therefore Mother's appeals are frivolous. *See Anders*, 386 U.S. at 744; *In re A.M.*, 495 S.W.3d 573, 582 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Accordingly, we affirm the trial court's decrees terminating Mother's parental rights to Kevin and Karen.

However, we deny Mother's counsel's motion to withdraw because this is a parental termination case. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (holding that *Anders* brief in parental termination is not "good cause" sufficient to justify counsel's withdrawal); *In re A.M.*, 495 S.W.3d at 582 (same). Counsel's duties to his client extend through the exhaustion or waiver of "all appeals." TEX. FAM.

CODE § 107.016(3)(B). If Mother chooses to pursue a petition for review to the Supreme Court of Texas, "appointed counsel's obligations can be satisfied by filing a petition for review that satisfies the standards for an *Anders* brief." *In re P.M.*, 520 S.W.3d at 27–28.

## Conclusion

We affirm the decrees of the trial court.

Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Hightower.